UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY MOORE,

          Plaintiff,

     v.

                              Case No. 2:07-cv-14640
                              District Judge: VICTORIA A. ROBERTS
                              Mag. Judge: CHARLES E. BINDER

UNITED STATES OF AMERICA,

          Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.     INTRODUCTION**

        This is a medical malpractice action brought under the Federal Tort Claims Act,

28 U.S.C. §§ 1346, 2671-80 (FTCA).  Plaintiff Gregory Moore (Mr. Moore), an inmate at

the Federal Correctional Institution at Milan, Michigan (FCI Milan), brought suit against

the United States of America; C. Eichenlaub, Warden at FCI Milan; and Dr. William

Malatinsky, Clinical Director at FCI Milan.  The Court *sua sponte* dismissed the claims

against Warden Eichenlaub and Dr. Malatinsky on October 22, 2008, in its Order

Adopting Magistrate Judge Charles E. Binder's Report and Recommendation.

        Mr. Moore's surviving claims against the United States are premised upon the

alleged malpractice of Dr. Malatinsky in his treatment of degenerative joint disorder

(DJD) in Mr. Moore's left shoulder and right ankle.  At the time of trial, Mr. Moore made

the following claims: (1) that Dr. Malatinsky committed malpractice by refusing to

authorize orthopedic surgery on Mr. Moore's shoulder and ankle; (2) that Dr. Malatinsky

2:07-cv-14640-VAR-CEB   Doc # 73   Filed 10/07/11   Pg 2 of 18   Pg ID 1187

committed malpractice by refusing to refer Mr. Moore for consultation with an outside orthopedic surgeon regarding his shoulder and ankle; and (3) that Dr. Malatinsky committed malpractice by failing to disclose that he lacked the qualifications to assess Mr. Moore's candidacy for surgery, and by failing to discuss the possible risks and benefits of orthopedic surgery with Mr. Moore.

Under the FTCA, the parties are not entitled to a jury.  The Court held a bench trial on October 4 and 5, 2011.

## II.    FINDINGS OF FACT

### A.    Background

1.  Plaintiff Mr. Moore is fifty one years old and suffers from DJD, i.e. osteoarthritis, in his left shoulder and right ankle.  Mr. Moore injured his left shoulder in the early 1990s while in state prison and has suffered from DJD in his shoulder since that time.  Mr. Moore injured his ankle while in county jail in 1996 and has suffered from DJD in that joint since then.  As a result of his DJD, Mr. Moore experiences swelling, pain, and bone-to-bone friction in both affected joints.

2.  In addition to DJD, Mr. Moore has several other chronic health problems, including Type-II diabetes, obesity, hypertension, and asthma.

3.  Mr. Moore has been in the custody of the Federal Bureau of Prisons (BOP) since September 23, 1996.  He was sentenced to a twenty year term of imprisonment. His projected release date is January 10, 2014.

4.  Shortly after being sentenced, Mr. Moore was assigned to the Federal Correctional Institution in Beckley, West Virginia (FCI Beckley).  Between February

2

1997 and November 1999, Mr. Moore was treated by Dr. Bateman at FCI Beckley a

total of five times for shoulder and ankle pain.  Dr. Bateman noticed that Mr. Moore

walked with a slight limp, and that he had limited range of motion in his left shoulder.

He recommended conservative treatment for both joints.  As to the ankle, Dr. Bateman

recommended longitudinal arch supports and orthotic shoes.  Dr. Bateman noted that

Mr. Moore would eventually need a total shoulder replacement, and recommended an

MRI.

5.  In November, 1999, Mr. Moore was transferred to the Federal Correctional

Institution at Elkton, Ohio (FCI Elkton).  On December 17, Mr. Moore underwent an MRI

on his shoulder as recommended by Dr. Bateman.  The MRI confirmed that Mr. Moore

suffered DJD in the shoulder.  On April 11, 2000, Mr. Moore saw an orthopedist, Dr.

Timothy Domer.  Dr. Domer diagnosed Mr. Moore with arthritis in both his shoulder and

ankle and recommended that conservative treatment continue.  He noted that Mr.

Moore's shoulder would need surgery sometime in the future.

6.  In April, 2001. Mr. Moore was transferred to the Federal Correctional

Institution at Ray Brook, New York (FCI Ray Brook).  While at FCI Ray Brook, Mr.

Moore was referred to orthopedist Dr. G. Mina a total of three times.  Dr. Mina noted

pain and limited range of motion in both the ankle and the shoulder.  He stated that Mr.

Moore would need both a total shoulder replacement and an ankle fusion, but noted that

the arthritis was not severe enough to warrant surgery at that time.  He recommended

continued conservative treatment.

7.  In April 2003, Mr. Moore was transferred to the Federal Correctional Institution

at Pekin, Illinois (FCI Pekin).  Mr. Moore was denied a request for an orthopedic

3

consultation by the Clinical Director at FCI Pekin.  As a result of the denial, Mr. Moore

filed a *Bivens* action against the Hospital Administrator at FCI Pekin alleging that the

denial of his request for an orthopedic referral amounted to cruel and unusual

punishment in violation of the Eighth Amendment.  The district court for the Central

District of Illinois granted summary judgment in favor of the Hospital Administrator.

     8.  On June 29, 2004, Mr. Moore was transferred to FCI Milan, where he remains

incarcerated at the present time.

     9.  Upon Mr. Moore's arrival at FCI Milan, Dr. Paul Harvey was the Clinical

Director and Dr. William Malatinsky was a staff physician at the facility.

     10.  In August, 2004, Dr. Malatinsky succeeded Dr. Harvey as Clinical Director at

FCI Milan.

     11.  Mr. Moore underwent a medical intake screening upon arrival at FCI Milan.

At the screening, Mr. Moore informed the staff of his ankle and shoulder conditions.  Mr.

Moore's medications for these conditions were continued.

     12.  The medical intake screening also revealed that Mr. Moore suffered from

Type-II diabetes, hypertension, high cholesterol, and asthma.  Mr. Moore's medications

for those conditions were continued.

     13.  Due to Mr. Moore's chronic health problems, he was designated to

participate in the Chronic Care Clinic at FCI Milan.  The BOP utilizes the Chronic Care

Clinic throughout the nation to schedule routine appointments for patients with chronic

medical problems.  Typically, a patient in the Chronic Care Clinic is seen by a physician

at least every six months, and a mid-level practitioner at least every three months.

14.   Mr. Moore received certain special accommodations at FCI Milan on account of his health problems.  He was excused from work assignments, restricted from heavy lifting and prolonged standing, and authorized to use soft shoes and sleep on a lower bunk.  Mr. Moore was included on the "early chow list" to avoid having to stand in line for food, though that privilege was later revoked for perceived abuses by Mr. Moore and lack of medical necessity.

      **B.**     **The Right Ankle**

15.   Dr. Malatinsky did not believe that Mr. Moore was a candidate for ankle fusion surgery in 2004 because no orthopedic specialist had recommended that he have surgery or that he be evaluated for surgery.

16.   On July 19, 2004, Mr. Moore was seen by Dr. Harvey at FCI Milan for an initial consultation.  Dr. Harvey noted DJD in Mr. Moore's right ankle.  Dr. Harvey referred Mr. Moore to an orthopedist, Dr. Kanwaldeep Sidhu.

17.   Dr. Sidhu is a board certified orthopedist who treats prisoners at FCI Milan pursuant to a contract with the BOP.  Under the terms of the contract, Dr. Sidhu visits FCI Milan once per month to see inmate patients.  The contract does not permit Dr. Sidhu to perform surgery.

18.   Dr. Sidhu examined Mr. Moore's right ankle on July 29, 2004.  Dr. Sidhu also reviewed x-rays.  Mr. Moore informed Dr. Sidhu that he had had ankle pain for several years and pain while walking.

19.   The examination revealed decreased range of motion in the ankle, as well as severe and persistent pain.

20.   Dr. Sidhu diagnosed that Mr. Moore suffered from DJD in his right ankle.

5

21.   Dr. Sidhu told Mr. Moore that he could get another opinion from an outside foot and ankle specialist to see if he would benefit from an ankle specialist.

22.   Dr. Sidhu's consultation report states: "Plz [please] refer to outside foot/ankle orthopedist to see if pt [patient] is a candidate for ankle fusion."

23.   An ankle fusion completely eliminates the ankle joint either through a steel rod or plates, and fuses the ankle bone to the leg bone so they no longer move independently.

24.   The primary purpose of an ankle fusion is to relieve pain.  It is not a common treatment, and is considered an option of last resort for severe pain.

25.   An ankle fusion does not increase function in the ankle.

26.   On July 29, 2004, Dr. Harvey reviewed Dr. Sidhu's consultation report and noted that he would schedule Mr. Moore for an orthopedic consultation to consider a possible right ankle fusion.  He encouraged Mr. Moore to make sure he understood the serious implications of an ankle fusion because it would be permanent.

27.   In late August, 2004, Dr. Malatinsky took over as Clinical Director at FCI Milan.

28.   On October 20, 2004, Dr. Malatinsky examined Mr. Moore in the Chronic Care Clinic.  Mr. Moore requested that Dr. Malatinsky make a referral so that he could be evaluated for potential surgery on his ankle.

29.   At this examination, Dr. Malatinsky noticed that Mr. Moore had walked into the clinic in a normal fashion but cried out in pain when Dr. Malatinsky lifted his right calf.  Additionally, despite the fact that he had been walking, Mr. Moore failed to offer

6

any muscular resistance when instructed to push against Dr. Malatinsky's hand with his right foot.  Dr. Malatinsky concluded that Mr. Moore was exaggerating his symptoms.

30.  Dr. Malatinsky also noted at this examination that Mr. Moore was in exceedingly poor control of his diabetes.  He advised Mr. Moore that he would need to get his diabetes under control before ankle surgery would be considered.

31.  Because Mr. Moore suffered from diabetes, appeared to be exaggerating his pain, and was relatively young, Dr. Malatinsky decided not to refer Mr. Moore to see an orthopedic surgeon outside of the BOP, despite Dr. Sidhu's recommendation.

32.  Dr. Sidhu, an orthopedic surgeon, was in a better position than Dr. Malatinsky, a family practitioner, to assess Mr. Moore as a candidate for ankle fusion surgery.

33.  Despite objective evidence of serious degenerative ankle disease, subjective complaints of pain, and a recommendation from Dr. Sidhu that Mr. Moore be evaluated for surgical intervention by an orthopedic surgeon outside of the BOP, Dr. Malatinsky failed to give a referral to Mr. Moore.

34.  Neither Mr. Moore's age nor diabetes would have prevented him from undergoing ankle fusion in 2004/2005, and the fact of his diabetes did not prevent him from discussing the risks and benefits of such surgery with an orthopedic surgeon.

35.  Ultimately, whether to undergo ankle fusion surgery would have been a decision for Mr. Moore to make with his orthopedic surgeon, after deciding if the benefits outweighed the risks.

36.  Dr. Malatinsky, in a sense, served as the "gatekeeper" for whether or not Mr. Mr. Moore could have ankle fusion surgery; Mr. Mr. Moore did not have the ability to

consult with an orthopedic doctor outside of the BOP without authorization from Dr. Malatinsky.

37.  Dr. Sidhu did not have the ability to send Mr. Moore to an outside doctor for a surgical consult, despite his recommendation to Dr. Malatinsky.

38.  On July 15, 2010, Dr. Malatinsky noted that Mr. Moore had made significant progress in controlling his diabetes.  Dr. Malatinsky initiated a referral for Mr. Moore's ankle, nearly six years after Dr. Sidhu's initial recommendation.

39.  FCI Milan uses a contract organization called Secure Care to schedule appointments for inmates with specialists in the community.  Dr. Malatinsky plays no role in the selection of specialists.

40.  Secure Care selected Dr. John Anderson, a board certified orthopedic surgeon, to examine Mr. Moore's ankle.

41.  Dr. Anderson was not informed of the pending civil action or that Mr. Moore was unhappy with his course of treatment at FCI Milan.

42.  On August 16, 2010, Dr. Anderson saw Mr. Moore.  He performed an examination of Mr. Moore's ankle and reviewed x-rays.

43.  Dr. Anderson noted that Mr. Moore's ankle was swollen, but that there appeared to be minimal pain and tenderness.

44.  Dr. Anderson determined that Mr. Moore was not a candidate for ankle fusion at that time.  He believed that Mr. Moore's ankle was already fused or nearly fused, so ankle fusion surgery never crossed his mind as a treatment option.

45.  Dr. Anderson recommended continued conservative treatment and that Mr. Moore return to see him on an as-needed basis.

46.  Some patients receive conservative treatment of osteoarthritis for life; degree of pain rather than duration of conservative treatment determines the appropriateness of ankle fusion surgery.

47.  Since 2004, no doctor who examined Mr. Moore opined that he should have ankle fusion surgery.

**C. The Left Shoulder**

48.  On June 17, 2005, Dr. Malatinsky examined Mr. Moore in the Chronic Care Clinic.  Mr. Moore stated that he was having severe pain in his shoulder that was causing him to awake at night.

49.  This was the first time Mr. Moore had complained about his shoulder to Dr. Malatinsky.

50.  Dr. Malatinsky referred Mr. Moore to an orthopedist, Dr. Sidhu, for a shoulder examination.

51.  On June 30, 2005, Dr. Sidhu examined Mr. Moore's shoulder in person.  Dr. Sidhu also examined x-rays.

52.  Mr. Moore reported that he had had a stiff shoulder for fifteen years.  On physical examination, he was able to do a forward flexion (raise his left arm) 0 to 50 degrees.  Normal range is 180 degrees; 50 degrees is below the shoulder level.

53.  Mr. Moore's x-rays showed severe DJD.

54. Dr. Sidhu concluded that Mr. Moore "will eventually need total should arthroplasty."

9

55.   Dr. Sidhu did not consider Mr. Moore to be an appropriate candidate for shoulder surgery at that time, in part because he considered Mr. Moore, at forty-six years old, to be too young.

56.   A total shoulder replacement involves inserting an artificial joint into the shoulder socket.  The life span of the artificial joint is approximately twenty years. Typically patients receive shoulder replacement surgery at an older age so that they are less likely to outlive the replacement joint.

57.   Between 2005 and 2010, Mr. Moore did not ask for a referral to see an orthopedic surgeon regarding his shoulder.

58.   On February 17, 2010, Dr. Malatinsky noted that it had been five years since Mr. Moore had seen an orthopedist for his shoulder.  He asked Mr. Moore if he would like to see an orthopedist again and Mr. Moore said yes.  Dr. Malatinsky submitted a consultation request asking that an orthopedist reevaluate Mr. Moore's shoulder.

59.   Dr. Sidhu saw Mr. Moore again for his left shoulder on February 24, 2010.

60.   Dr. Sidhu concluded that Mr. Moore continued to have DJD in his left shoulder, although radiographically, his range of motion was about the same and his x-ray appearance was about the same as in 2005.

61.   Dr. Sidhu recommended that Mr. Moore be referred outside of the BOP to a shoulder specialist to see if he was a candidate for surgical intervention of his shoulder.

62.   Secure Care again chose Dr. Anderson, an orthopedic surgeon, for evaluation of Mr. Moore's left shoulder.  Dr. Anderson saw Mr. Moore on May 25, 2010.

63.   Dr. Anderson reviewed x-rays and performed a physical examination.

10

64. Based on the apparent pain-free motion of Mr. Moore's shoulder, Mr. Moore's relatively young age, and Mr. Moore's comorbidities, especially diabetes, Dr. Anderson concluded that Mr. Moore was not then a candidate for shoulder replacement.

65. Mr. Moore would not have been a more likely candidate for shoulder replacement surgery in 2005, 2007 or 2008 than he was in 2010.

66. No doctor since 2004 who has examined Mr. Moore has opined that he should have shoulder replacement surgery.

**D. Damages**

67. The primary purpose of ankle fusion and shoulder replacement surgery is to relieve pain and not to restore motion.

68. There is no guarantee that the surgical outcome for either surgery would be the relief of pain; and, some patients can even be worse post surgery because of surgical complications.

69. No evidence support's Mr. Moore's claim that he suffered increased pain as a result of not having received a referral to see an orthopedic surgeon outside of the BOP in 2004 for his ankle, and in 2005 for his shoulder.

70. The fact that Mr. Moore has not had surgery does not seem to have materially impacted his activities of daily living.

71. Although prescribed a cane for use on July 7, 2005, as late as 2008 the cane prescribed for Mr. Moore was still in its package under his bed.  Senior Officer Daniel Swetz questioned the medical necessity of the cane since it was not in use.

72. Until approximately three weeks ago, several employees at FCI Milan never saw Mr. Moore use his cane.

11

73.  Both in clinical examination and just in general observations, Mr. Moore is seen to have a normal gait except for a slight limp.

74.  Mr. Moore has often been observed standing in the commissary line for up to 1 ½ hours with seemingly little trouble.

75.  In the last year, Mr. Moore requested a Gate Pass approximately twenty times. A Gate Pass would have enabled him to work a job outside the prison fence.  All Gate Pass jobs require physical labor.  Examples include shoveling snow, landscaping, automobile maintenance, plumbing, and other residential maintenance activities.

76.  Gate Pass jobs require inmates to work five days per week for six or seven hours per day.  The inmate workers stand on their feet for the majority of that time.

77.  There is no evidence that Mr. Moore's overall health has suffered or deteriorated as a result of Dr. Malatinsky's failure to refer him to an orthopedic surgeon outside of the BOP until 2010.

78.  Mr. Moore did not suffer harm as a result of the delay in referring him to an orthopedic surgeon outside of the BOP; there is still no recommendation that he undergo surgery for either his ankle or his shoulder.

## III. CONCLUSIONS OF LAW

1.  In Federal Tort Claims Act cases, the Court must follow the law of the state in which the alleged negligence occurred.  28 U.S.C. § 1346(b); *Schindler v. United States*, 661 F.2d 552, 554 n.2 (6th Cir. 1981).  Under the FTCA, the United States is liable "in the same manner and in the same extent as a private individual under like circumstances. . ."  28 U.S.C. § 2674.

12

2.  Dr. Malatinsky's alleged medical malpractice occurred in Michigan, so Michigan law applies.

3.  To prevail on a medical malpractice claim under Michigan law, plaintiff must show: (1) the applicable standard of care; (2) breach of that standard by defendant during the course of the professional relationship; (3) injury; and (4) proximate causation by the breach and the injury.  *See*, *e.g.*, *Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 308 (Mich. 2004); *Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W.2d 455, 464-65 (Mich. 1999).

### A. Plaintiff's claim that Dr. Malatinsky committed malpractice by refusing to authorize orthopedic surgery on Mr. Moore's shoulder and ankle

4.  Dr. Malatinsky did not breach the standard of care by refusing to authorize orthopedic surgery on Mr. Moore's shoulder and ankle.  Unrebutted evidence shows that not a single orthopedist recommended surgery on either Mr. Moore's left shoulder or right ankle.  Most recently, in the summer of 2010, Dr. Anderson concluded that Mr. Moore was not currently a candidate for shoulder replacement surgery or ankle fusion surgery.  If Mr. Moore was not a candidate for these surgeries in 2010, he would not have been a candidate at any earlier date.  While several orthopedists have concluded that Mr. Moore may be a candidate for surgery in the future, all have recommended continuation of conservative treatment until some time in the future.  Because Dr. Malatinsky is a family practitioner and not an orthopedist, it would have been unreasonable for him to ignore the specialists and authorize orthopedic surgery in the face of unanimous opposition from orthopedists.  Plaintiff's own expert, Dr. Felman, suggested that it would be malpractice to authorize surgery as a family practitioner

13

against the unanimous advice of various specialists.  Dr. Moskwa, confirmed this view.

Because the standard of care did not require Dr. Malatinsky to authorize surgery against

the advice of several orthopedic specialists, Plaintiff fails on this count.

**B.  Plaintiff's claim that Dr. Malatinsky committed malpractice by failing to disclose that he lacked the qualifications to assess Mr. Moore's candidacy for surgery, and by failing to discuss the possible risks and benefits of orthopedic surgery with Mr. Moore**.

5.  Dr. Malatinsky did not breach the standard of care by failing to disclose that

he lacked the qualifications to assess Mr. Moore's candidacy for surgery, or by failing to

discuss the risks and benefits of possible orthopedic surgery.  Mr. Moore had been

seeing orthopedic specialists on a regular basis since at least 1999, during his time at

FCI Elkton.  He met with orthopedist Dr. Mina at least three times during his time at FCI

Ray Brook.  He filed a lawsuit while at FCI Pekin alleging that the prison's failure to refer

him to an orthopedic surgeon violated his Eighth Amendment rights.  When he arrived

at FCI Milan, he immediately asked to be referred to an orthopedist.  Under these facts,

it is ludicrous to suggest that the standard of care required Dr. Malatinsky to make a pro

forma disclosure that there are people called orthopedists who would be better able to

care for Mr. Moore's DJD.  Dr. Malatinsky did not breach the standard of care.

6.  Mr. Moore's claim that Dr. Malatinsky breached the standard of care by failing

to discuss the possible risks and benefits of orthopedic surgery is subsumed into his

claim that Dr. Malatinsky breached the standard of care by failing to refer, discussed

below.  Discussion of the risks and benefits of orthopedic surgery is primarily the

responsibility of the orthopedic surgeon, not the family practitioner.

14

C.   **Mr. Moore's claim that Dr. Malatinsky committed malpractice by refusing to refer Mr. Moore for consultation with an outside orthopedic surgeon regarding his shoulder and ankle**

1.   **The Left Shoulder**

7.   Dr. Malatinsky did not breach the standard of care by refusing to refer Mr. Moore to an outside orthopedist for a consultation on his left shoulder.  When Mr. Moore arrived at FCI Milan in 2004, no orthopedist had recommended shoulder surgery, or that Mr. Moore be referred to an orthopedist for discussion of the risks and benefits of shoulder surgery.  The very first time that Mr. Moore asked Dr. Malatinsky for an orthopedic referral for his shoulder, in June 2005, Dr. Malatinsky immediately referred Mr. Moore to Dr. Sidhu, an orthopedist.  Dr. Sidhu examined Mr. Moore soon thereafter and determined that he was not a candidate for shoulder surgery at that time.  The issue of seeing an orthopedist for Mr. Moore's shoulder did not arise again until 2010, and only then because Dr. Malatinsky initiated the discussion.  In the five year period between 2005 and 2010, Mr. Moore never asked for a referral to see an orthopedist about his shoulder.  Mr. Moore agreed to see an orthopedist in 2010, and he was sent back to Dr. Sidhu.  On February 24, 2010, Dr. Sidhu saw Mr. Moore and recommended that he be referred to an outside orthopedist to determine if he was a suitable candidate for surgery.  Dr. Malatinsky immediately accepted this recommendation and initiated the referral process.  On May 25, Mr. Moore was seen by Dr. Anderson, who determined that Mr. Moore was still not a candidate for shoulder surgery.  The evidence shows that on the two occasions Dr. Malatinsky was asked to make a referral regarding Mr. Moore's shoulder–the first time in 2005, and the second in 2010–Dr. Malatinsky quickly

15

granted those requests.  Dr. Malatinsky did not breach the standard of care by refusing to refer Mr. Moore to an orthopedic surgeon for a shoulder consultation.

### 2. The Right Ankle

8.  Dr. Malatinsky breached the standard of care by refusing to refer Mr. Moore to an orthopedic surgeon for a consultation on his right ankle.  In light of objective findings on x-ray that Mr. Moore suffered from severe osteoarthritis in his ankle, subjective complaints of pain by Mr. Moore, Dr. Sidhu's opinion in 2005 that Mr. Moore should be referred to an outside orthopedic surgeon to discuss the possibility of surgery, and the fact that Mr. Moore could not go anywhere without Dr. Malatinsky allowing him, Dr. Malatinsky unreasonably withheld an ankle referral from Mr. Moore.

9.  The decision to undergo joint surgery involves the consideration of many factors including the patient's age, the severity of the patient's pain, the patient's failure to respond to conservative treatment, and other medical conditions that might complicate the surgery.  The patient considers these factors when determining the potential risks and benefits of surgery.  The patient's orthopedic surgeon, rather than family practitioner, is best equipped to assist the patient in weighing these factors before making a decision.  The patient and the orthopedic surgeon engage in a dialogue regarding whether to have surgery.  Dr. Malatinsky was not qualified to have this dialogue with Mr. Moore.  Though Dr. Malatinsky may have had valid reasons for believing that Mr. Moore was not a candidate for ankle surgery, Mr. Moore was at least entitled to a second opinion on the matter, especially one from an orthopedic specialist who would have been more qualified to make a determination on the appropriateness of surgery.  The standard of care inside the prison system is the same as the standard of

16

care outside of the prison system.  Civilian patients are free to seek second opinions when they disagree with a doctor's decision.  Dr. Malatinsky's absolute power over referrals, and unreasonable refusal to exercise that power despite a recommendation from Dr. Sidhu in 2005 that he do so, was a breach of the standard of care.

10.  Mr. Moore's diabetes was not an absolute contraindication of surgery.  Many patients with diabetes undergo joint surgery.  There are a number of medications and pre-operative procedures that could have been used to manage Mr. Moore's diabetes in anticipation of surgery.  Additionally, Mr. Moore's lower extremities were neurovascularly intact, greatly reducing the risk of amputation.  Using the promise of a surgical referral as a "carrot and stick" to compel Mr. Moore to improve his diabetes may have been reasonable and appropriate for a period of a couple of months; it was not reasonable that it lasted six years.

11.  As discussed below, however, Mr. Moore did not show injury that flowed from Dr. Malatinsky's breach.  Mr. Moore is therefore not entitled to damages.

**D. Damages**

12.  As stated above, the elements of medical malpractice in Michigan are: (1) the applicable standard of care; (2) breach of that standard of care; (3) injury; and (4) proximate causation.  Thus, even if a plaintiff demonstrates a breach of the standard of care, plaintiff cannot recover without also showing injury and causation.

13. Mr. Moore has not proven that he was damaged by Dr. Malatinsky's failure to timely refer him to an orthopedic surgeon for an ankle consultation.  When Mr. Moore finally saw an outside orthopedic surgeon, Dr. Anderson in August of 2010, the doctor concluded he was not a candidate for surgery at that time.  In addition, the state of Mr.

17

Moore's disease does not appear to have changed between 2005 and 2010.  If Mr.

Moore was not a candidate for surgery in 2010, he would not have been a candidate

during any of the previous years.  Mr. Moore cannot prove that if Dr. Malatinsky had

referred him to an outside orthopedist in 2005, or any other year prior to 2010, the result

would have been different.  Additionally, any attempt by Mr. Moore to put a dollar value

on the opportunity to seek a second opinion is simply too speculative to support an

award of damages.

14.  Based on the above findings, Mr. Moore is not entitled to recover any

damages for Dr. Malatinsky's breach.

## IV.  CONCLUSION

These are findings of fact and conclusions of law.  An appropriate order

accompanies these findings and conclusions.  Judgment will enter for the United States.

**ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  October 7, 2011

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
October 7, 2011.

s/Linda Vertriest
Deputy Clerk

18